UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID PIERRE-JONES,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>JEREMY DEFRANCO,<br><br>　　　　Defendant. | Case No.: 1:24-cv-00904-KES-CDB<br><br>FINDINGS AND RECOMMENDATIONS TO GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br><br>(Doc. 38)<br><br>14-DAY OBJECTION DEADLINE |

Plaintiff David Pierre-Jones is proceeding pro se and *in forma pauperis* in this civil rights action pursuant to 42 U.S.C. § 1983. This action proceeds against Defendant Jeremy DeFranco for deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment. (Docs. 1, 5.)

**I.　INTRODUCTION**

On November 10, 2025, Defendants filed a motion for summary judgment. (Doc. 38.) Defendant's motion included a *Rand*[1] warning, addressing the requirements for an opposition to a motion for summary judgment. (Doc. 38-2.) More than 21 days passed after Defendant's filing and service of his motion; yet, Plaintiff failed to file an opposition or statement of non-opposition to the motion.

---

[1] *Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998).

Accordingly, on December 16, 2025, the Court issued its Order to Show Cause ("OSC") in Writing Why Sanctions Should Not Be Imposed for Plaintiff's Failure to File an Opposition or Statement of Non-Opposition. (Doc. 43.) Plaintiff was ordered to respond to the OSC within 14 days, or, alternatively, to file an opposition or statement of non-opposition to Defendant's motion for summary judgment. (*Id.*)

To date, Plaintiff has failed to file an opposition to Defendant's summary judgment motion and the time to do so has passed. Given the foregoing, the Court considers Defendant's summary judgment motion to be unopposed.

## II.     APPLICABLE LEGAL STANDARDS

### *Motions for Summary Judgment*

Summary judgment is appropriate when it is demonstrated that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting that a fact cannot be disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials...." Fed. R. Civ. P. 56(c)(1)(A).

Summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of their pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists or shows

2

that the materials cited by the movant do not establish the absence of a genuine dispute. *See* Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Further, the opposing party must also demonstrate that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987). In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Service, Inc.*, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the evidence of the opposing party is to be believed. *See Anderson*, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. *See Matsushita*, 475 U.S. at 587. Nevertheless, inferences are not drawn "out of thin air," and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

A court may grant an unopposed or inadequately opposed motion for summary judgment if the supporting papers are sufficient to warrant granting the motion and do not on their face reveal a genuine issue of material fact. *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993).

*Eighth Amendment: Deliberate Indifference to Serious Medical Need*

Prison officials violate the Eighth Amendment if they are "deliberate[ly] indifferen[t] to [a prisoner's] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "A medical need is serious if failure to treat it will result in 'significant injury or the unnecessary and wanton infliction of pain.'" *Peralta v. Dillard*, 744 F.3d 1076, 1081–82 (9th Cir. 2014) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds by *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc)).

To maintain an Eighth Amendment claim based on medical care in prison, a plaintiff must first "show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Second, the plaintiff must show the Defendant's response to the need was deliberately indifferent." *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (quoting *Jett*, 439 F.3d at 1096 (quotation marks omitted)).

As to the first prong, indications of a serious medical need "include the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (citation & internal quotation marks omitted); accord *Wilhelm*, 680 F.3d at 1122; *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) ("Examples of serious medical needs include '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain").

As to the second prong, deliberate indifference is "a state of mind more blameworthy than negligence" and "requires 'more than ordinary lack of due care for the prisoner's interests or safety.'" *Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). Deliberate indifference is shown where a prison official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to

abate it." *Id.* at 847. In medical cases, this requires showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference. *Wilhelm*, 680 F.3d at 1122 (quoting *Jett*, 439 F.3d at 1096). "A prisoner need not show his harm was substantial; however, such would provide additional support for the inmate's claim that the defendant was deliberately indifferent to his needs." *Jett*, 439 F.3d at 1096 (citing *McGuckin*, 974 F.2d at 1060).

Deliberate indifference is a high legal standard. *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). "Under this standard, the prison official must not only 'be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" *Id.* at 1057 (quoting *Farmer*, 511 U.S. at 837). "'If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk.'" *Id.* (quoting *Gibson v. County of Washoe, Nevada*, 290 F.3d 1175, 1188 (9th Cir. 2002)).

To prevail on a deliberate-indifference claim, a plaintiff must also show that harm resulted from a defendant's wrongful conduct. *Wilhelm*, 680 F.3d at 1122; *see Jett*, 439 F.3d at 1096; *Hallett v. Morgan*, 296 F.3d 732, 746 (9th Cir. 2002) (prisoner alleging deliberate indifference based on delay in treatment must show delay led to further injury).

### III.     PLAINTIFF'S ALLEGATIONS

In his complaint, Plaintiff alleges that on February 29, 2024, while he was incarcerated at the California Correctional Institution ("CCI"), he reported to medical officials that he was "in a suicidal train of thought." (Doc. 1 at 3.) Defendant responded to Plaintiff's report and explained that he was a doctor with mental health. *Id*. Plaintiff then told Defendant he had metal in his mouth, and he was "going to take it and use it to cut [his] arms and [his] insides." *Id*. Defendant directed "custody" to take Plaintiff to a holding cell, where Plaintiff began to cut himself on the arm until he bled. *Id*. Defendant allegedly learned that Plaintiff had cut himself and "cleared" Plaintiff from having suicidal ideation despite Plaintiff having swallowed metal scraps in front of Defendant. *Id*.

///

**IV.    DEFENDANT'S STATEMENT OF UNDISPUTED FACTS**

Defendant submitted the following statements of undisputed facts:

1. Plaintiff David Pierre-Jones is an inmate in the custody of California Department of Corrections and Rehabilitation (CDCR). At all times relevant to the Complaint, Pierre-Jones was housed at [CCI].

2. Defendant Dr. DeFranco is a board-certified psychiatrist and at all relevant times, worked at CCI. At all times, he has been up to date on all trainings and license renewals required of mental health professionals at CDCR, including suicide prevention training.

3. Dr. DeFranco received a Bachelor of Science from Temple University in 2005 and a Doctor of Medicine from Temple University School of Medicine in 2009. He completed his General Psychiatry Residency in 2015 at the University of California Los Angeles/San Fernando Valley and in 2016 completed a Geriatric Psychiatry Fellowship at University of California Los Angeles.

4. From 2012 through 2019, Dr. DeFranco worked for a number of community mental health programs providing psychiatric care to a variety of patients, including in emergency, outpatient, inpatient, and consultation services. From March 2019 to March 2020, Dr. DeFranco served as a consulting psychiatrist, providing outpatient psychiatric services to underserved children and adolescents involved with the Department of Children and Family Services and provided intensive psychiatric care to adults enrolled in a collaborative Full Service Partnership program, including adults enrolled in DSH Diversion and Community Restoration programs within Los Angeles County. From August 2020 to January 2021, Dr. DeFranco worked as a consulting telepsychiatrist for CDCR, providing psychiatric care to inmates within an intensive outpatient level of care. From March 2021 to September 2022, he worked for CDCR's California Healthcare Facility, providing psychiatric care to inmates within an acute and intermediate inpatient setting. From March, 2023 to present, Dr. DeFranco worked as a psychiatrist for CDCR with [a] duty location at CCI, providing psychiatric care to

6

    prison inmates within the CCCMS [Correctional Clinical Case Management System] (outpatient) and EOP [Enhanced Outpatient Program] (intensive outpatient) levels of care, and routinely evaluating inmates with urgent and emergent mental health complaints, and determining whether a higher level of care (e.g. admission to a mental health crisis bed) is necessary.

5. Pierre-Jones first set forth his claim against Dr. DeFranco in a Health Care Grievance dated March 2, 2024.

6. Mental health care and treatment for patients in CDCR is based on court-approved policies and procedures contained in the department's Mental Health Services Delivery System (MHSDS) Program Guide, most recently updated in 2021. The Program Guide is posted online at https://cchcs.ca.gov/wpcontent/uploads/sites/60/2021-Program-Guide-2.1.22.pdf. This document delineates care guidelines for patients at all levels of custody in CDCR. Specifically, mental health services are based on "levels of care" assigned through screening and evaluation by mental health clinicians. Levels of care denote the acuity of an incarcerated individual's mental health needs and ability to function in a correctional environment. The lowest (i.e. least acute) level of care is the Correctional Clinical Case Management System (CCCMS) which exists in almost all CDCR institutions. For patients with higher levels of acuity and chronic mental health problems or those suffering from mental health crises, the Enhanced Outpatient Program (EOP) level of care provides more intensive individual and group treatment in protected housing units. For patients in need of inpatient psychiatric treatment, the department has short-term and longer-term inpatient facilities. The Mental Health Crisis Bed (Crisis Bed) level of care provides crisis stabilization and treatment in licensed hospital units for up to ten days, while the Acute Inpatient and Intermediate levels of care treat patients for up to six months in licensed psychiatric hospital settings.

7. The MHSDS Program Guide specifies in Chapter 10, Section D that "[a]ny CDCR employee … who becomes aware of an inmate's current suicidal ideation, threats,

gestures, self-injurious behaviors or suicide attempts shall immediately notify a member of the health care staff. The inmate shall be placed under direct observation … until a clinician trained to perform a suicide risk assessment … conducts a face-to-face evaluation."

8. Suicide risk evaluations are documented in CDCR's electronic health records system (EHRS) in a document called the Suicide Risk and Self-Harm Evaluation (Suicide Risk Evaluation). The Suicide Risk Evaluation contains information about current and historical suicidal ideation, lifetime and recent risk and protective factors for suicide, and current risk for suicide. It also uses a standardized set of questions about suicidal behavior, intent, and planning called the Columbia Suicide Severity Rating Scale (Columbia Rating Scale). The Colombia Rating Scale is commonly used in both community and correctional settings to aid clinician evaluations of suicide risk.

9. The Suicide Risk Evaluation is used by CDCR mental health clinicians to document contact with collateral sources of information, a mental status exam, and a suicide safety plan, which flows directly from the clinician's judgment of risk. The Suicide Risk Evaluation is completed each time a patient is evaluated for suicide risk. All CDCR mental health clinicians, including contract staff, have significant training on the assessment of suicide risk. They receive seven hours of training every two years and annual refresher courses as well as one-to-one mentoring. Institutional suicide prevention programs conduct periodic audits of Suicide Risk Evaluations and provide feedback to clinicians about their work.

10. Pierre-Jones has been continuously in CDCR custody since March 19, 2020. Pierre-Jones was transferred from the North Kern State Prison reception center to the Substance Abuse and Treatment Facility at Corcoran, California on September 30, 2020. On February 8, 2024, Pierre-Jones was transferred to [CCI] at Tehachapi, California. On April 5, 2024, Pierre-Jones was transferred from CCI to Kern Valley State Prison.

11. On March 23, 2020, Pierre-Jones entered the MHSDS at the CCCMS [least acute] level of care. Pierre-Jones has remained a patient in the MHSDS at the CCCMS for the duration of his incarceration in CDCR.

12. On February 8, 2024, Dr. DeFranco evaluated Pierre-Jones for suicide risk in response to Pierre-Jones' report that he was suicidal and documented the evaluation in a Suicide Risk Evaluation. Dr. DeFranco reviewed and relied on the February 8 Suicide Risk Evaluation when he evaluated Pierre-Jones' risk for suicide on February 29, 2024.

13. During the February 8 evaluation, Pierre-Jones told Dr. DeFranco that he has safety concerns due to his commitment offense, and he was attacked because of his sex offender status. He reported that he is a schizophrenic and has paranoia[;] however [,] he did not present with any objective signs of psychosis, paranoia or schizophrenia. Although he claimed to have auditory hallucinations, reporting that he hears voices, Dr. DeFranco did not observe him to be internally preoccupied, distracted, or responding to internal stimuli. Pierre-Jones was lean and well-groomed, well-related, made appropriate eye contact, did not demonstrate any negative symptoms, and was completely linear, logical, and goal-directed. He did not present as hypervigilant, suspicious, or paranoid. He asked Dr. DeFranco several times to be sent to a crisis bed, and at one point stated, "I gotta get out of this facility . . . You gotta help me . . . You gotta send me to crisis bed . . . send me to EOP . . . I need a higher level of care bro," referencing his reported safety concerns related to his commitment offense. Pierre-Jones repeatedly endorsed suicidal ideation but was evasive and vague when asked for details. After repeated attempts to elicit more information, he stated he would "get a razor, cut myself."

14. Dr. DeFranco spoke with custody staff and learned that Pierre-Jones' safety concerns would be addressed by placing him into the Restricted Housing Unit. When Dr. DeFranco reported this to Pierre-Jones, he demanded to be admitted to a crisis bed and when told that he would not be admitted to a crisis bed he stated that he swallowed a razor. Dr. DeFranco then advised Pierre-Jones that he would be sent to an outside

9

hospital for x-rays but that he would not be sent to a crisis bed. When Dr. DeFranco told Pierre-Jones that he would be happy to evaluate him again should he continue to report suicidal ideation upon return from the outside hospital, Pierre-Jones stated "ah, fine, I'm going to AdSeg."

15. Pierre-Jones formally retracted his statement that he swallowed a razor and declined to be sent to the outside hospital for x-rays.

16. Dr. DeFranco's February 8 assessment of Pierre-Jones was that custody had addressed his safety concerns by placing him into the Restricted Housing Unit, pending further investigation of his reported safety concerns, and that he did not meet the criteria for Danger to Self and did not need a referral to a higher level of care.

17. At 12:32 a.m. on February 9, 2024, shortly after Dr. DeFranco's Suicide Risk Evaluation, Pierre-Jones reported to a Psychiatric Technician that he was not suicidal and that he did not have any mental health concerns. Pierre-Jones reported to his social worker on February 14, 2024, that he did not want to hurt himself and could wait to meet with staff to discuss anxiety and depression. On February 27, 2024, Pierre-Jones met with his interdisciplinary treatment team (IDTT) who elected to retain him at the CCCMS [least acute] level of care with no changes to his treatment plan.

18. On February 29, 2024, Pierre-Jones reported to nursing staff that he ingested a foreign body and was suicidal. Dr. DeFranco responded on February 29 to the referral for an emergent evaluation of Pierre-Jones for suicide risk and documented his assessment in a Suicide Risk Evaluation. Pierre-Jones reported to Dr. DeFranco that he was suicidal; that he had thoughts of killing himself; that he had swallowed a button in an attempt to kill himself and if that did not work, he would hang himself.

19. As part of his February 29 evaluation of Pierre-Jones, Dr. DeFranco documented Pierre-Jones' safety and enemy concerns and that they were "investigated [by custody staff] and [were] deemed unsubstantiated." Dr. DeFranco spoke with the lieutenant on duty and learned that Pierre-Jones wanted to be removed from A yard due to safety and enemy concerns that were not substantiated. The officers observed Pierre-Jones in

the dayroom talking and laughing with other inmates and one of the inmates was observed handing Pierre-Jones some food. Dr. DeFranco's assessment was that Pierre-Jones was attempting to bypass decisions made by custody staff and using the mental health system to manipulate his housing placement.

20. Dr. DeFranco learned from his review of Pierre-Jones' medical records and his interview of Pierre-Jones on February 29 that Pierre-Jones had no history of actual suicide attempts but did have a history of ingesting foreign bodies in the context of wanting to be housed at another facility. He also learned that Pierre-Jones had no personal or family history of suicide attempts or suicides; no history of self-harm; Pierre-Jones' reported suicidal ideation and reported psychotic symptoms were incongruent with his presentation, and most consistent with impression management and wanting to use the mental health system to manipulate his housing; Pierre-Jones was not currently exhibiting any signs or sequelae of psychosis, was not currently acutely anxious or acutely agitated, and he did not currently exhibit any signs or symptoms of acute substance intoxication or withdrawal; and Pierre-Jones had numerous robust protective factors, including very strong self-preserving behaviors, and future oriented thinking.

21. Plaintiff's statements, presentation and demeanor on February 29 did not indicate to Dr. DeFranco that he was genuinely suicidal or that his threat of or alleged self-harm indicated any intent to die. As documented in the February 29 Suicide Risk Evaluation, Dr. DeFranco assessed twelve protective factors against suicide and found that all twelve applied to Pierre-Jones. Of the thirty-four chronic and acute risk factors for suicide, Pierre-Jones only met eight. Dr. DeFranco determined that Pierre-Jones' acute and chronic risk of suicide was low based on Pierre-Jones' history and Dr. DeFranco's observation and assessment. Dr. DeFranco's assessment was consistent with his February 8 assessment of Pierre-Jones.

22. It is not uncommon for inmates to misreport suicidal ideation or to threaten or engage in self-harm with minimal injury to attempt to gain access to different housing. Many

inmates engage in these behaviors to try to gain access to the Crisis Bed or Restricted Housing Unit. Acquiescence to maladaptive behaviors, such as misreporting suicidal ideation and/or superficial self-harm for secondary gain, reinforces those behaviors.

23. Pierre-Jones' actions, statements, and behavior on February 29 were not a departure from Pierre-Jones' prior actions. His alleged self-harm and statements on February 29 did not indicate to Dr. DeFranco that Pierre- Jones had a heightened risk of suicide. Pierre-Jones' presentation during the evaluation was controlled, coherent, calm, and oriented. Pierre-Jones did not exhibit any concerning factors that would lead Dr. DeFranco to believe he had any impairment in his mental status. Dr. DeFranco concluded that Pierre-Jones' statements that he was suicidal and that his self-harm was done to change his housing assignment, rather than genuine suicidality.

24. Based on his Suicide Risk Evaluation, Dr. DeFranco's plan for Pierre-Jones was to retain him at the same level of care, continue his current mental health medications, and have a consult with his primary clinician to ensure that he had timely follow-up care with mental health staff.

25. With respect to Pierre-Jones' claim that he swallowed a button, Dr. DeFranco confirmed with medical staff that they were managing the claimed ingestion of the foreign body by prescribing Lactulose, a laxative designed to help Pierre-Jones pass the button.

26. On March 1, 2024, Pierre-Jones reported to nursing staff that he needed medical treatment for scratches to his arm. He put in a request for medical services to be seen for the scratches stating, "[n]eed to be seen because I have a lot of scratches on my arm in an attempted suicide. They are causing me a lot of pain."

27. On March 2, 2024, a psychiatric technician noted Pierre-Jones' report that "by sending him to Facility A [general population] that CCI custody is trying to kill him." "[He] denied any mental health concerns." He also told the psychiatric technician that "due to a lawsuit he has[,] custody is after him."

28. Pierre-Jones was seen on March 3 by nursing staff who described his injury as superficial scratches that they treated with Tylenol.

29. Dr. DeFranco examined Pierre-Jones on March 2 and noted that Pierre-Jones confirmed that the marks on his arm were "scratches" which Dr. DeFranco observed to be superficial and almost healed. Dr. DeFranco's chart notes indicate that Pierre-Jones adopted a dismissive, arrogant, and confrontational style. He threatened Dr. DeFranco with grievances and legal actions ("do you know what malpractice is?"). As in previous interviews, Pierre-Jones did not manifest typical signs of psychosis.

30. On March 4, 2024, Pierre-Jones was interviewed by a mental health clinician who noted that Pierre-Jones had been transferred back to a restricted housing unit due to "safety concerns" despite having been released to the general prison population the same day. Pierre-Jones told the clinician that he "wants to work on his anxiety, wants a change of [medications]" and that "[t]here are inmates who want to kill me because of my case factors."

31. Pierre-Jones was seen by a mental health clinician on March 11, 2024, and reported to the clinician that he felt "OK" and displayed no signs or symptoms of acute distress or mental health disorder.

32. The physical injuries that Pierre-Jones attributed to Dr. DeFranco's February 29 evaluation are limited to superficial scratches he made to his arm. After Dr. DeFranco evaluated Pierre-Jones and cleared him to return to his housing unit, Pierre-Jones used a paperclip-sized piece of metal to inflict an inch-long scratch on his left arm that bled for a moment.

33. The subjective statements that a patient is suicidal, even if the patient engages in high visibility/low lethality behaviors (such as superficial self-harm in front of staff), are not sufficient to indicate that a patient should be admitted to the Crisis Bed or placed on suicide watch. But under these circumstances, a clinician should perform a full assessment and look at a number of factors to determine whether the patient is genuinely suicidal or genuinely intends to die. Pierre-Jones medical record (EHRS)

13

documents Dr. DeFranco's clinical encounters with him on February 8, February 29, and March 2, 2024. During those encounters, Pierre-Jones made statements revealing his desire to be moved to either a new prison ("I gotta get out of this facility") or be moved to a higher level of mental health care ("You gotta send me to [Crisis Bed]"). In addition, his claimed suicidality was manifestly not authentic as there were no significant depressive symptoms observed and no acute distress (other than related to his safety concerns). His suicidal statements changed when he realized that his initial statements were not accomplishing his intended goal: getting a razor to cut himself changed to claiming to have swallowed a razor (February 8, 2024). These encounters were all in the context of his desire for a change of housing and fear for his safety.

34. Dr. DeFranco followed CDCR mental health policy and procedures during his encounters with Pierre-Jones. Pierre-Jones was seen within the guidelines set out for emergent responses (four hours) and each time Dr. DeFranco completed both a psychiatric assessment and a thorough suicide risk assessment according to CDCR policy. Dr. DeFranco's assessment that Pierre-Jones did not require a higher level of mental health care was appropriate and justified by the patient's mental status, presentation, and his own statements.

35. Dr. DeFranco's care of Pierre-Jones met the standard of care for emergency evaluations of suicidality within the correctional setting. His suicidal risk evaluations were in line with the literature on performing and documenting risk assessments. Dr. DeFranco interviewed Pierre-Jones, reviewed previous records, consulted with custodial sources, documented a systematic evaluation of risk and protective factors, conducted a mental status exam, made judgements of risk (both Chronic and Acute) with justification, and made a disposition based on his assessment and review or records.

36. Dr. DeFranco documented his thorough evaluations and based on the patient's presentation, statements, and the context, made what was the correct disposition for

14

        Pierre-Jones. Dr. DeFranco's decisions were medically acceptable under the circumstances.

(*See* Doc. 38-3 [hereafter UDF] (internal citations omitted).)[2]

## V.  DISCUSSION

Defendant asserts the following arguments: (1) Defendant is not liable for medical indifference because Plaintiff did not have a serious medical need and Defendant did not disregard a known risk of harm to Plaintiff; and (2) Defendant is entitled to qualified immunity because he did not violate Plaintiff's constitutional rights, and his conduct was objectively reasonable. (Doc. 38-1 at 19-25.)

The Court has reviewed all the evidence presented, including supporting declarations of defense counsel, defense expert R. Canning, Ph.D., and Defendant J. DeFranco, along with a transcript from Plaintiff's deposition taken August 26, 2025, including all exhibits, and Plaintiff's verified complaint.

### A. *Defendant Is Entitled to Summary Judgment on Plaintiff's Eighth Amendment Deliberate Indifference to Serious Medical Needs Claim*

Defendant argues that he was not deliberately indifferent to Plaintiff's medical needs. Specifically, Defendant asserts that Plaintiff did not have a serious medical need because "Plaintiff did not have a heightened risk of suicide at the time of [Defendant's] evaluation." (*Id.* at 19-21.) Defendant also argues that he did not disregard a known risk of harm to Plaintiff. (*Id.* at 21-24.)

---

[2] Because Plaintiff did not file an opposition, he neither admitted nor denied the facts set forth by Defendants as undisputed nor filed a separate statement of disputed facts. Local Rule 260(b). A verified complaint in a pro se civil rights action may constitute an opposing affidavit for purposes of the summary judgment rule, where the complaint is based on an inmate's personal knowledge of admissible evidence, and not merely on the inmate's belief. *McElyea v. Babbitt*, 833 F.2d 196, 197–98 (9th Cir. 1987) (per curiam); *Lew v. Kona Hosp.*, 754 F.2d 1420, 1423 (9th Cir. 1985); Fed. R. Civ. P. 56(e). Here, because Plaintiff has not complied with Rule 260(b), the Court deems Plaintiff to have admitted those facts not disputed by his complaint or other submissions. *See, e.g., Beard v. Banks*, 548 U.S. 521, 527 (2006) ("by failing specifically to challenge the facts identified in the defendant's statement of undisputed facts, [plaintiff] is deemed to have admitted the validity of the facts contained in the [defendant's] statement"); *Brito v. Barr*, No. 2:18-CV-00097-KJM-DB, 2020 WL 4003824, at *6 (E.D. Cal. July 15, 2020) (deeming defendant's undisputed facts as admitted after plaintiff failed to comply with Local Rule 260(b)); *see also Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (nonmovant's contentions in other pleadings are to be considered in connection with summary judgment motion so long as attested to under penalty of perjury).

In evaluating Plaintiff's claim for deliberate indifference to serious medical needs, the Court's recommendation turns on Defendant's subjective understanding of the risk of serious harm to Plaintiff and Defendant's response. Were the Court to find that Plaintiff had an objectively serious risk of committing suicide, Plaintiff has not demonstrated a genuine issue of material fact that Defendant disregarded a known risk of harm.

Defendant completed a Suicide Risk Evaluation for Plaintiff on February 29, 2024. In his evaluations and assessments, Defendant spoke with Plaintiff face-to-face to gather information on his condition, symptoms, and intentions, as well as reviewed his medical and mental health treatment records. UDF 18-20. In his evaluation, Defendant found that Plaintiff had no personal or family history of suicide attempts but did have a history of ingesting foreign bodies to force reassignment to another housing facility. UDF 20. At the time of the evaluation, Plaintiff was not exhibiting signs of psychosis, and his reported suicidal ideation and "reported psychotic symptoms were incongruent with his presentation, and most consistent with impression management and wanting to use [the] mental health system to manipulate his housing…." *Id.* Defendant assessed that Plaintiff "was not currently exhibiting any signs or sequelae of psychosis, was not currently acutely anxious or acutely agitated, and he did not currently exhibit any signs or symptoms of acute substance intoxication or withdrawal…." *Id.* Defendant evaluated Plaintiff as having "numerous robust protective factors, including very strong self-preserving behaviors and future-oriented thinking." *Id.*

"Plaintiff's statements, presentation[,] and demeanor on February 29 did not indicate to [Defendant] that [Plaintiff] was genuinely suicidal or that his threat of or alleged self-harm indicated any intent to die." UDF 21. Defendant "assessed twelve protective factors against suicide and found that all twelve applied to [Plaintiff]." *Id.* "Of the thirty-four chronic and acute risk factors for suicide," Defendant assessed that Plaintiff "only met eight." *Id.* Defendant concluded in his evaluation that Plaintiff's "acute and chronic risk of suicide was low based on [Plaintiff's] history and [Defendant's] observation and assessment." *Id.* Defendant then consulted with medical staff to ensure that a care plan was in progress to address the button that Plaintiff swallowed by prescribing a laxative. UDF 25.

16

Thus, Defendant has met his initial burden by demonstrating there is no genuine dispute as to any material fact concerning Plaintiff's deliberate indifference to serious medical needs claim. Fed. R. Civ. P. 56(a). Therefore, the burden shifts to Plaintiff as the non-moving party to establish that a genuine issue as to any material fact actually does exist. *Matsushita*, 475 U.S. at 586. Plaintiff has failed to do so; he has tendered no evidence to support this claim. Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11; *Henry*, 983 F.2d at 950.

Further, the assertions made in Plaintiff's complaint do not establish the existence of any factual dispute. *See* Fed. R. Civ. P. 56(c); *Beard*, 548 U.S. at 527; *McElyea*, 833 F.2d at 197–98. Although he alleges generally that Defendant's "deliberate indifference to my serious medical need promptly caused me to hurt myself by scraping my arm until it bled," Plaintiff acknowledges that Defendant came to his cell "in response" to Plaintiff reporting "a suicidal train of thoughts." (Doc. 1 at 3.) He also confirmed that Defendant elicited information about his symptoms, made his assessment, and "cleared" Plaintiff to return to the holding cell. (*Id.*).

Plaintiff has not alleged or offered evidence under Fed. R. Civ. P. 56 that Defendant subjectively believed that Plaintiff was suicidal yet refused to act. Rather, Plaintiff's complaint expresses a difference of opinion as to how Defendant should have responded to Plaintiff's statements of suicidality. However, a difference of opinion between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment is not enough to establish a deliberate indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989); *Toguchi*, 391 F.3d at 1058. In short, Plaintiff has failed to offer proof concerning an Eighth Amendment deliberate indifference to serious medical needs claim against Defendant. *Celotex*, 477 U.S. at 322.

In conclusion, the record taken as a whole would not lead a rational trier of fact to find for Plaintiff on his Eighth Amendment deliberate indifference to serious medical needs claim. *Matsushita*, 475 U.S. at 587. Therefore, the Court will recommend Defendant's motion for summary judgment be granted.

### B. The Remaining Argument

The Court will not address Defendant's argument that he is entitled to qualified immunity

because it recommends that Defendant's motion for summary judgment be granted as discussed above.

## VI.  CONCLUSION AND RECOMMENDATION

Accordingly, based upon the foregoing, this Court **HEREBY RECOMMENDS**:

1.  Defendant's motion for summary judgment (Doc. 38) be **GRANTED**;

2.  Judgment be entered in favor of Defendant DeFranco and against Plaintiff; and

3.  The Clerk of the Court be directed to close this case.

These Findings and Recommendations will be submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). **Within 14 days** after being served with a copy of these Findings and Recommendations, a party may file written objections with the Court. Local Rule 304(b). The document should be captioned, "Objections to Magistrate Judge's Findings and Recommendations" and **shall not exceed 15 pages** without leave of Court and good cause shown. The Court will not consider exhibits attached to the Objections. To the extent a party wishes to refer to any exhibit(s), the party should reference the exhibit in the record by its CM/ECF document and page number, when possible, or otherwise reference the exhibit with specificity. Any pages filed in excess of the 15- page limitation may be disregarded by the District Judge when reviewing these Findings and Recommendations under 28 U.S.C. § 636(b)(l)(C). A party's failure to file any objections within the specified time may result in the waiver of certain rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014).

IT IS SO ORDERED.

Dated:  **February 5, 2026**                     _____
                                                 UNITED STATES MAGISTRATE JUDGE